Charles MUNAFO, Plaintiff–Appellee,

v.

METROPOLITAN TRANSPORTATION AUTHORITY, New York City Transit Authority, Staten Island Rapid Transit Operating Authority, Alfonse W. Sorrentino, individually and in his official capacity, Peter Argenziano individually and in his official capacity, Samuel Holmes, individually and in his official capacity, John McCabe, individually and in his official capacity, Owen P. Swords, individually and in his official capacity, David C. Filimon, individually and in his official capacity, Rosemary Healy, a/k/a Rosemary Lake, John Does 1–4 and Jane Does 1–4, Defendants–Appellants,

Louis Russo, Martin Scheinman, and Michael Caputo, Defendants.

Docket No. 01–7161.

United States Court of Appeals, Second Circuit.

Argued Sept. 10, 2001.

Decided March 26, 2002.

**204**

Scott A. Korenbaum, New York, NY, for Plaintiff–Appellee.

Ira J. Lipton, New York, NY, (Hoguet, Newman & Regal, New York, NY, Mary Jennings Mahon, General Counsel, Metropolitan Transportation Authority, Barbara C. Neale, New York, NY, on the brief), for Defendants–Appellants.

Before KEARSE, MINER, and F.I. PARKER, Circuit Judges.

KEARSE, Circuit Judge.

Defendants Metropolitan Transportation Authority ("MTA") *et al.* appeal from an order of the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge,* denying their motions pursuant to Fed.R.Civ.P. 56 to dismiss the complaint of plaintiff Charles Munafo, brought principally under 42 U.S.C. § 1983 (1994), asserting that he was subjected to discipline and to termination of his employment in retaliation for the exercise of his First Amendment rights and in violation of his right to due process. The district court denied appellants' motions for summary judgment on the ground that there are factual issues to be tried. On appeal, the individual defendants-appellants pursue their contention that they were entitled to summary judgment on the basis of qualified immunity; the institutional defendants seek summary judgment on the ground that Munafo cannot show a violation of his federal rights. For the reasons that follow, we conclude that the district court should have granted the individual appellants' motions to dismiss the due process claims on qualified immunity grounds because Munafo failed to present a cognizable claim against those defendants for violation of due process. In all other respects, we dismiss the appeals for lack of appellate jurisdiction.

## I. BACKGROUND

MTA is a public benefit corporation created by New York State law, charged with operating public transportation in the New York City metropolitan area. Defendants Staten Island Rapid Transit Operating Authority ("SIRTOA") and New York City Transit Authority ("NYCTA") are operat-

ing units of MTA (collectively the "corporate defendants").

Munafo was employed by MTA from 1987 until March 1999 and was assigned to SIRTOA, where he held various positions in the Maintenance of Way Department ("Track Department"). During that period, Munafo lodged a series of complaints about what he perceived to be safety problems in Track Department operations. He was also subject to a number of disciplinary actions, culminating in the termination of his employment in 1999.

During the pertinent period, most of the individual defendants-appellants (hereinafter the "individual defendants") were managerial employees at SIRTOA. Defendant Alfonse W. Sorrentino was a supervisor in the Track Department and was Munafo's supervisor. Defendants Peter Argenziano, John McCabe, Samuel Holmes, and David C. Filimon were SIRTOA officials who presided over various phases of the disciplinary proceedings against Munafo. Defendant Owen P. Swords was SIRTOA's Superintendent or General Superintendent of Operations and approved several of the disciplinary findings and actions taken against Munafo. Defendant Rosemary Healy was a SIRTOA secretary who transcribed the disciplinary hearing that culminated in Munafo's termination.

In the present case, Munafo seeks redress for the disciplinary actions taken against him. He contends that those actions were taken because of his persistent criticisms of unsafe practices and conditions at SIRTOA and because of his union activities. Defendants contend that the disciplinary actions were taken because Munafo was repeatedly disobedient and insubordinate. The record, taken in the light most favorable to Munafo as the party against whom summary judgment was requested, may be summarized as follows.

## A.  *Safety Complaints by Munafo in 1994*

Prior to June 15, 1994, SIRTOA used forms known as "vehicle condition reports" to document the condition of SIRTOA equipment. In an affidavit submitted in opposition to defendants' motions for summary judgment, Munafo stated that at a 1993 training session conducted by NYCTA,

> I, and other SIRTOA employees, were directed to complete, for the purpose of ensuring the health and safety of employees, "vehicle condition reports" for "anything that has an engine." . . .
>
> 11.  Given the important safety-related implications of these forms, I adhered to [the NYCTA instructor's] directions as strictly as possible, regularly completing vehicle condition reports for vehicles which I operated.
>
> 12.  The vehicle condition reports revealed numerous safety problems with SIRTOA's vehicles. For example, employees were required to operate some vehicles with hydraulic leaks and without brakes, endangering their own, and the general public's safety.

(Affidavit of Charles J. Munafo dated October 23, 2000 ("Munafo Aff."), ¶¶ 10–12.)

On or about June 15, 1994, SIRTOA issued a directive instructing employees to make their reports with respect to certain equipment in maintenance log books, and "prohibiting the completion of vehicle condition reports" (*id.* ¶ 13). Munafo, however, believed the vehicle condition reports were superior, allowing employees to record more accurately the condition of the vehicles. Although he began making reports in the maintenance log books as instructed by management, he also continued to file vehicle condition reports:

> 14.  Concerned with documenting the unsafe conditions of the vehicles, I continued to complete the vehicle condition

reports. As instructed by management, I also completed another "form," called the "maintenance log book," in addition to, not in lieu of, the vehicle condition report.

15. Unlike the "vehicle condition reports," the "maintenance log books" did not include space to report crucial pre-trip and post-trip safety problems....

16. Because "maintenance log books" did not include "carbon copies," and would frequently go "missing," the reporting employee would have no way to prove that he had reported unsafe conditions. "Vehicle condition reports" included carbon copies, enabling the reporting employee to document the fact that safety issues had been reported.

17. Given SIRTOA management's refusal to acknowledge receipt of "vehicle condition reports," the carbon copies retained by reporting employees served as the only evidence of the unsafe conditions of SIRTOA vehicles.

18. I continued to complete and submit both the "maintenance log books" and the "vehicle condition reports" to SIRTOA management.

(*Id.* ¶¶ 14–18.) Munafo insisted on filing both types of reports because he "refused to hide or disguise the unsafe conditions of the vehicles." (*Id.* ¶ 20.)

B. *Disciplinary Actions Against Munafo*

One week after SIRTOA ordered that there be no further vehicle condition reports, the first of the disciplinary actions of which Munafo principally complains occurred.

1. *The 1994 "Tire Incident"*

On June 22, 1994, while Munafo was operating a piece of equipment, he heard a "pop" and believed that a tire on his machine had gone flat. The tire was repaired by SIRTOA mechanics; Munafo filled out a vehicle condition report. That afternoon, Sorrentino instructed Munafo to prepare an "incident report," a document that becomes a potentially adverse part of the employee's personnel file.

Sorrentino returned later in the day to collect the incident report but discovered Munafo had not prepared it. The next morning, Sorrentino again instructed Munafo to fill out such a report. Believing that no other employees had been required to file incident reports for flat tires, Munafo accused Sorrentino of trying to punish him for continuing to document and protest against unsafe conditions. Munafo refused to fill out an incident report unless Sorrentino provided a written statement of his reasons for requesting it. On the same day, June 23, Munafo filed a complaint with the MTA Office of Inspector General, protesting that Sorrentino's actions were harassment in retaliation for Munafo's safety-related protests.

On June 24, Sorrentino sent Munafo a written notice, charging him with insubordination for the refusal to comply with Sorrentino's direct orders of June 22 and June 23 to prepare an incident report on the tire, and stating that a hearing would be held on July 1. The hearing, postponed at Munafo's request in order to allow him to obtain counsel, was held on July 14. Argenziano presided; Munafo and Sorrentino, along with several witnesses called by Munafo, testified. Munafo complains that Argenziano refused to call six of the 11 persons on Munafo's proposed witness list.

Following the hearing, Argenziano issued a written decision upholding the insubordination charge. In deciding on an appropriate sanction, Argenziano reviewed Munafo's record, which included a 10–day suspension in 1991 for insubordination, a five-day suspension in 1991 for threatening a co-worker, and a 30–day suspension in 1992 for leaving his work site without per-

mission and falsely stating that permission had been given. Argenziano ruled that, with respect to the 1994 tire incident, Munafo should be suspended for 30 days, demoted, and permanently barred from operating any vehicle requiring a commercial driver's license.

For nearly four years thereafter, Munafo's union, the United Transportation Union ("UTU"), appealed, without success, Argenziano's decision through administrative channels. The ruling by Argenziano was upheld by SIRTOA's General Superintendent McCabe; McCabe's decision was upheld by SIRTOA's Acting General Manager Holmes. The UTU unsuccessfully sought review by the National Railroad Adjustment Board. The disciplinary decisions were eventually upheld by the Standing Board on Arbitration ("SBA"), a joint union-employer body, in March 1998.

In July 1998, Munafo commenced the present action, *see* Part I.C. below, complaining principally that the discipline imposed on him in connection with the 1994 tire incident was retaliation for his union activities and his complaints about safety-related issues.

### 2. *Additional Safety Complaints by Munafo*

In the meantime, in December 1994, Munafo was elected vice-chairman of the UTU, a position he had held previously. In that capacity, he represented employees at meetings with management and "apprised them, among other things, of their right to a safe work environment." (Munafo Aff. ¶ 45.)

Munafo also continued to lodge complaints about various employment matters, including SIRTOA's safety practices. For example, in January 1995, he complained that employees assigned to perform welding were being required to work without the appropriate respiratory equipment. In June 1995, he protested the fact that SIRTOA employees were being required to work in unsafe proximity to the " 'live' " third rail, in violation of state and federal law requiring them to be at least three feet away from 600 volt electricity unless the power lines are shut off or the workers are protected by rubber matting. (*Id.* ¶ 66.) He also continuously protested other health and safety-related matters such as smoking in the workplace.

### 3. *The 1998 "Caputo Incident"*

On October 19, 1998, Munafo learned that Sorrentino had summoned trackworker Michael Caputo to a meeting to discuss an accident report pertaining to a work-related injury Caputo had sustained. Upon hearing that Munafo intended to accompany Caputo to the meeting, Sorrentino informed the foreman of Munafo's crew that the meeting was to be merely a safety interview and not a disciplinary proceeding and that Munafo should not attend. Accordingly, Munafo was advised that if he left his work assignment to attend the meeting he would not be paid.

Munafo nonetheless attempted to accompany Caputo to the meeting, planning to serve as Caputo's union representative and to be a witness. When he and Caputo arrived at the offices where the meeting was to be held, Sorrentino informed Munafo that he was not invited and instructed him to return to his work site. Munafo refused and was insistent on attending the meeting, or at least on making telephone calls to explore the nature of the meeting. Sorrentino repeatedly ordered Munafo to return to work, would not allow him to use the office telephones, and insisted that Caputo accompany Sorrentino to meet with the safety officer.

The exchange between Munafo and Sorrentino lasted some 15 minutes. Sorrentino

finally left for the meeting; Caputo remained behind with Munafo. Munafo then made a series of telephone calls to various members of SIRTOA management; he had another conversation with Sorrentino, who again directed him to return to work; and he finally was assured by the safety officer that the purpose of the meeting was simply to discuss details of the accident. The safety officer directed Munafo to return to his work site. Munafo then instructed Caputo to go to the meeting; Munafo returned to work, having been absent from his work site for more than two hours.

That evening Sorrentino telephoned Munafo and informed him that he was being suspended for insubordination; on the following day Sorrentino served him with notice that the hearing would be held on October 28, 1998. The notice

> charged that on the morning and afternoon of October 19, 1998, between 11:50 AM and 2:00 PM, you provided false information to your foreman, absented yourself from your job site without permission, refused to comply with a repeated direct order to return to your job site and acted in a rebellious, insubordinate and threatening manner when directed repeatedly to return to your work site.

(Letter from Sorrentino to Munafo dated October 20, 1998.)

After an adjournment requested by Munafo, the hearing was begun on November 5, 1998; the hearing officer was Filimon, who was then SIRTOA's Deputy Superintendent of Transportation. Munafo attended, represented by counsel, but did not testify. The witnesses included Sorrentino and Caputo; the latter testified that he had told Munafo of the scheduled meeting with Sorrentino and the safety officer about his accident report, but that he had not asked Munafo to accompany him. Munafo's counsel made a closing statement in which he argued that Munafo was entitled to conduct himself as he had.

In March 1999, Filimon upheld the charges against Munafo. His decision stated, *inter alia*, that "on October 19, 1998 you refused to comply with a directive to return to your duties, ... absenting yourself from your job site without permission and acted in a rebellious and insubordinate manner to your supervisor...." (Letter from Filimon to Munafo dated March 12, 1999, at 1.) Filimon stated that in "deciding what discipline to assess ... the serious nature of the substantiated charges, your service record, and the fact that even when given an opportunity at the Hearing to present a reasonable explanation for your actions, you elected not to provide any testimony, were all taken into consideration." (*Id.* at 2.) Filimon concluded that the "only appropriate action is *DISMISSAL* from the employ of the Staten Island Railway, effective immediately." (*Id.* at 3 (emphasis in original).)

Munafo appealed Filimon's decision to Argenziano but sought to argue the appeal only by telephone rather than in a face-to-face conference. Argenziano responded that this would be contrary to SIRTOA policy. He rescheduled the conference once, stating that if Munafo did not appear, Argenziano would regard the matter closed. Munafo did not appear, and Argenziano left Filimon's decision undisturbed. Munafo next appealed Argenziano's decision to McCabe; but again he did not appear at the meeting scheduled to discuss his appeal. McCabe therefore left Argenziano's decision undisturbed. In addition, the UTU pursued appeals on Munafo's behalf, but again Munafo refused to attend the scheduled hearings. Eventually, the SBA upheld the SIRTOA decisions, concluding that the dismissal was an appropriate disciplinary action.

Munafo did not seek further review by way of a judicial proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules, *see* N.Y.C.P.L.R. § 7801 *et seq.* (McKinney 1994) ("Article 78").

## C. The Present Action

Munafo commenced the present action in 1998, shortly after the conclusion of the administrative appeals of his suspension in connection with the 1994 tire incident. He alleged principally that the suspension constituted retaliation in violation of his rights under the First Amendment and that he had been denied due process. After the termination of his employment in 1999, Munafo amended his complaint to add claims that the termination was in retaliation for his continuing criticisms of SIRTOA's safety practices and his actions as a union officer. In addition, in January 2000, Munafo commenced a new and overlapping action, which was consolidated with his original action.

All defendants moved for summary judgment, arguing principally that Munafo could not prevail on his First Amendment claims because (a) he was disciplined for insubordinate conduct, and (b) his speech was not protected by the First Amendment because it did not deal with matters of public concern. They argued that his due process claims should be dismissed because Munafo had been accorded all the process he was due under the collective bargaining agreement that governed union disciplinary proceedings. The individual defendants also asserted that they were entitled to summary judgment on the basis of qualified immunity.

Munafo responded by submitting affidavits and documents, including his own affidavit recounting his safety complaints and union activities and reiterating his view that he had been singled out for special treatment and discipline in retaliation for those complaints and activities. Munafo charged that SIRTOA management had sought to silence his complaints in order to enhance SIRTOA's safety record and to avoid the expense of providing safe equipment and a safe working environment.

Following oral argument on the motions, the district court, to the extent pertinent to this appeal, denied summary judgment to defendants-appellants. Although the court itself found Munafo's factual contentions unpersuasive, it concluded that summary judgment should be denied because there was a triable issue as to the reason for the disciplinary actions, and that Munafo might persuade a jury. Addressing Munafo's counsel at the hearing, the court stated:

> I'm going to allow your suit to go forward, because there are issues of fact. I'm telling you now, based on the papers I have seen, the case seems to me to be wholly frivolous and an abuse of the federal process.
>
> As far as I can see from these papers, we have a disaffected and sullen employee who is ordered on a variety of occasions to do things and he refuses to do them, insisting that he will decide what he's going to do.
>
> There is an element of free speech. The jury may decide you are right, in which case we'll go forward with a judgment. . . .
>
> I have hardly ever in my work as a judge in this court, seen a case that appears on its face to have less merit and is so abusive of the system and the defendants. I don't understand, really, how counsel can bring it.
>
> But it's open; and you'll get a trial, if you want it.

(Hearing Transcript, December 13, 2000 ("Tr."), at 16–17; *see also id.* at 18 ("I think there's enough allegations to support

a denial of a summary-judgment motion...."").)

The court also denied the motions to dismiss Munafo's due process claims, stating only that, "given the extensive protections of the union[-]employer procedures involved," those claims appeared to be "even more tenuous" than the First Amendment claims. (*Id.* at 21.)

## II. DISCUSSION

The individual defendants have appealed the denial of their motions for summary judgment based on the defense of qualified immunity. The corporate defendants ask us to exercise pendent appellate jurisdiction and reverse the district court's denial of their motion for summary judgment on the ground that Munafo's claims lack merit. For the reasons that follow, we conclude that we lack jurisdiction over the appeal by the individual defendants insofar as they assert qualified immunity with respect to Munafo's First Amendment claims; we conclude that the individual defendants were entitled to qualified immunity as a matter of law with respect to the due process claims; and we decline to exercise pendent appellate jurisdiction over the appeal by the corporate defendants.

■■■ A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law, *see, e.g., County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred, *see, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 817–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); or (3) if the defendant's action was "objective[ly] legal[ly] reasonable[ ] ... in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted); *see Harlow v. Fitzgerald,* 457 U.S. at 819, 102 S.Ct. 2727. Because the immunity not only protects against a judgment for damages but also "is in part an entitlement not to be forced to litigate," *Mitchell v. Forsyth,* 472 U.S. 511, 526–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), early resolution of the qualified immunity defense is encouraged, *see, e.g., Harlow v. Fitzgerald,* 457 U.S. at 817–18, 102 S.Ct. 2727, and a defendant may properly move for summary judgment dismissing the plaintiff's claim on that basis where there are no genuinely disputed factual issues material to the defense, *see, e.g., Mitchell v. Forsyth,* 472 U.S. at 526, 105 S.Ct. 2806.

■■■ A denial of summary judgment is ordinarily not an appealable "final decision" within the meaning of 28 U.S.C. § 1291 (1994). *See, e.g., Johnson v. Jones,* 515 U.S. 304, 309–10, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Under the collateral order doctrine, however, a district court's denial of a summary judgment motion that is based on a substantial claim of qualified immunity is immediately appealable where the district court has rejected the defense as a matter of law. *See, e.g., Mitchell v. Forsyth,* 472 U.S. at 525–27, 530, 105 S.Ct. 2806; *Locurto v. Safir,* 264 F.3d 154, 162 (2d Cir.2001); *X–Men Security, Inc. v. Pataki,* 196 F.3d 56, 65 (2d Cir.1999); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990). To be appealable immediately, the qualified-immunity denial must present " 'a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.' " *Johnson v. Jones,* 515 U.S. at 313,

115 S.Ct. 2151 (quoting *Mitchell v. Forsyth,* 472 U.S. at 530 n. 10, 105 S.Ct. 2806). If the district court has ruled that adjudication of the immunity defense requires resolution of genuinely disputed questions of material fact, the denial of summary judgment on that basis is not immediately appealable. Where the district court's summary judgment order, though entered on a qualified-immunity-based motion, has "determine[d] only a question of 'evidence sufficiency,' *i.e.,* which facts a party may, or may not, be able to prove at trial," it is a "kind of order [that] is not appealable." *Johnson v. Jones,* 515 U.S. at 313, 319–320, 115 S.Ct. 2151; *see, e.g., Locurto v. Safir,* 264 F.3d at 162; *Tolbert v. Queens College,* 164 F.3d 132, 139 (2d Cir.1999).

■■■ The issue of "whether the plaintiff has asserted a violation of a constitutional right at all" is a "purely legal question." *Siegert v. Gilley,* 500 U.S. at 232, 111 S.Ct. 1789. If the complaint does not allege a cognizable federal claim, the defendant is entitled to have his qualified-immunity motion granted promptly as a matter of law. *See, e.g., id.; Mitchell v. Forsyth,* 472 U.S. at 526–30, 105 S.Ct. 2806; *X–Men Security, Inc. v. Pataki,* 196 F.3d at 66. A defendant may also obtain a purely legal ruling from the district court by stipulating to the plaintiff's version of the facts for purposes of the qualified-immunity-based summary judgment motion. *See, e.g., Salim v. Proulx,* 93 F.3d 86, 89–90 (2d Cir.1996). But in the absence of a dispositive question that is purely one of law, the court of appeals lacks jurisdiction to review the denial of summary judgment if the district court has found that there is a genuine issue of fact to be tried as to the immunity defense, and "there is no hypothetical assumption by appellant[ ] that [he] engaged in the conduct that [the appellee] alleges." *Tolbert v. Queens College,* 164 F.3d at 139.

Under these principles, we conclude that, on the present record, we have jurisdiction over the individual defendants' appeal of the denial of their qualified-immunity-based motions for summary judgment with respect to Munafo's due process claims, but not over their appeal with respect to the First Amendment retaliation claims. We address the two sets of claims in reverse order.

A.  *Qualified Immunity With Respect to the First Amendment Claims*

■■■ Munafo's complaint alleges that defendants suspended him and terminated his employment in retaliation for the exercise of his First Amendment rights. It is clearly established that, although a governmental entity enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their speech on matters of public importance. *See, e.g., Waters v. Churchill,* 511 U.S. 661, 668, 671–75, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Rankin v. McPherson,* 483 U.S. 378, 383–84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The employee's right to be free from such retaliation has been clearly established since at least 1968.

■■■ Defendants contend that this prohibition is inapplicable here as a matter of law because Munafo's complaints were no more than internal personnel grievances relating to matters of his own personal interest. Given the requirements that we accept the allegations of the complaint as true and take the record in the light most favorable to Munafo as the party against whom summary judgment is sought, de-

fendants' premise borders on the frivolous. The complaint and Munafo's affidavit assert that Munafo was speaking out—both in filing complaints and in dealing with members of his union—on matters of safety. He complained of, *inter alia*, trackworkers' being forced to operate in unlawful proximity to live rails without protective gear, welders' being forced to work without respirators, and drivers' being assigned vehicles with faulty brakes. If one needed to consult more than common sense, one would need look no farther than the existence of laws such as the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et. seq.* (1994), and similar state laws, *see, e.g.,* N.Y. Lab. Law § 202 *et seq.* (McKinney Supp.2001), to recognize that safety in the workplace is a matter of public concern.

■ The principal issue in this case is whether defendants' treatment of Munafo was in fact motivated by his safety complaints and union activities, as Munafo contends, or was instead punishment for disobedience and insubordination. The question of defendants' motivation plainly remains in dispute. Defendants have not stipulated to Munafo's contention that he was singled out and punished because of his union activities and his repeated complaints that SIRTOA was engaging in practices that endangered its employees and the public; nor could they so stipulate without establishing their own liability. Rather, they contend that "here, there is a 'total absence of evidence' to support a claim that defendant[s] violated plaintiff's federal rights" (Defendants' brief on appeal at 50), and that no rational juror could fail to infer that defendants' motivation for disciplining Munafo was his insubordinate conduct (*see id.* at 51–52). These contentions are congruent with the merits, and the district court, though indicating that it viewed defendants as having

much the stronger side of the case factually, denied summary judgment "because there are issues of fact" as to why Munafo was disciplined (Tr. 16), and because Munafo had come forward with sufficient evidence to support a verdict (*see id.* at 16 ("The jury may decide you are right, in which case we'll go forward with a judgment.")). Accordingly, the district court's denial of the individual defendants' qualified-immunity-based motions for summary judgment dismissing Munafo's First Amendment claims is not immediately appealable.

**B.** *Qualified Immunity With Respect to the Due Process Claims*

We reach the opposite conclusion with respect to Munafo's due process claims against the individual defendants, for we conclude that based on the record before us, Munafo has presented no cognizable due process claim against them.

■ An employee who has a property interest in his employment "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story," before he is subjected to the loss of employment. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Defendants do not dispute that Munafo "had a 'property interest' in his [employment with SIRTOA], the deprivation of which implicates the Due Process Clause" (Defendants' brief on appeal at 58), and there is no question that Munafo's right to due process was clearly established at the time his employment was terminated. However, "procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." *Locurto v. Safir,* 264 F.3d at 171;

*see Cleveland Board of Education. v. Loudermill,* 470 U.S. at 545–48, 105 S.Ct. 1487. Further, if the state affords a remedy for alleged violations of due process, the plaintiff may not complain about the sufficiency of a due process remedy by singling out one stage in the administrative proceedings and ignoring the rest of the array of procedures available to him. *See, e.g., Campo v. NYCERS,* 843 F.2d 96, 101–02 (2d Cir.1988), *cert. denied,* 488 U.S. 889, 109 S.Ct. 220, 102 L.Ed.2d 211 (1988).

The district court, in denying the individual defendants' qualified-immunity-based motions for summary judgment dismissing Munafo's due process claims, made only the terse statement that "given the extensive protections of the union[-]employer procedures involved," Munafo's due process claims were "even more tenuous" than his First Amendment claims. (Tr. 21.) The district court did not identify any particular issue to be tried with respect to the due process claims. Accordingly, this Court, in order to review the individual defendants' contention that the district court's ruling on this branch of their qualified immunity motions mistakenly identified clearly established law, must "undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Johnson v. Jones,* 515 U.S. at 319, 115 S.Ct. 2151.

The record in this case includes Munafo's complaint, his affidavit, and the statements filed by the parties pursuant to Rule 56.1 of the Local Rules for the Eastern District in connection with the summary judgment motions ("Rule 56.1 Statements"). Our review of the record, including the Rule 56.1 assertions by defendants that Munafo did not materially dispute, leads us to the conclusion that, based on the uncontroverted facts, Munafo as a matter of law has not presented a cognizable due process claim against the individual defendants.

Although Munafo contends that SIRTOA's disciplinary procedures were infected with bias and, as applied, did not provide due process, there is no genuine dispute that SIRTOA, pursuant to its collective bargaining agreement with UTU (the "Agreement"), had in place the following procedures to afford a disaffected employee an opportunity to be heard in connection with the imposition of discipline:

25. Rule 32 of the Agreement provides that an employee "shall not be disciplined or dismissed without a fair and impartial hearing"; and that, pending such hearing, the employee may be held out of service. This rule further provides that the employee "shall be notified in writing of the precise charge against him/her"; that the notice specify the date and time of the hearing; that the employee be given the opportunity to secure witnesses and a representative, if so desired; that a transcript be made of the hearing and furnished to the employee and his representative, and that a decision be rendered in writing, with a copy furnished to the employee and representative. . . .

26. The longstanding practice between SIRTOA and the UTU with respect to the presentation of charges of misconduct against employees is for a SIRTOA manager with knowledge of the alleged misconduct ("the charging officer") to present a letter to the employee setting forth the charges as well as the time and place of the hearing. The hearing officer is designated by the General Superintendent in charge of the employee's division. . . .

27. Rule 32 also provides that an employee dissatisfied with the decision

of the hearing officer may appeal said decision "in accordance with the provisions of the Grievance Rule["] (*i.e.*, Rule 33), first to SIRTOA's "General Superintendent" and finally, to SIRTOA's Chief Officer. (Defendants' Rule 56.1 Statement ¶¶ 25–27, as admitted in Munafo's Rule 56.1 Counterstatement ¶¶ 25–27.)

Nor is it disputed that, in connection with the disciplinary actions in question, Sorrentino gave Munafo written notice of the charges against him and of the dates for which hearings were scheduled; that Argenziano and Filimon as hearing officers gave Munafo an opportunity to be represented by counsel, to attend the hearings, and to present his versions of the events, sometimes postponing scheduled hearing dates in order to afford those opportunities; that Healy prepared a transcript of the hearing that culminated in Munafo's dismissal; that Argenziano and Filimon made their respective rulings in writing and sent copies to Munafo; and that Munafo had opportunities to appeal.

For example, in connection with the October 19, 1998 incident that culminated in the termination of his employment, Munafo was served on October 20 with a written notice that, as quoted in Part I.B.3. above, specified the insubordination charges and stated that a hearing would be held on October 28. Munafo requested an adjournment in order to be represented by counsel, and the hearing thus began on November 5. The ensuing proceedings were conducted before Filimon on various days between December 17, 1998, and February 23, 1999, and consumed a total of some 16–24 hours. (*See, e.g.*, Rule 56.1 Statements ¶ 127; Munafo Aff. ¶ 108.) A record of the proceedings was made by Healy on a word processor. Filimon rendered his written decision in a letter to Munafo in March 1999. Munafo thereafter had opportunities to appeal Filimon's decision to Argenziano and McCabe. There is no dispute that Munafo declined to appear at the conferences scheduled by Argenziano and McCabe for consideration of his appeals.

Not controverting these facts, Munafo argues principally that the hearing officers were biased against him because of his continual safety complaints and union activities; that the disciplinary system itself was unfair because, *inter alia*, SIRTOA supervisors officiated at hearings and appeals; that better hearing transcripts could have been prepared had he been allowed to hire a professional stenographer; that the transcripts that were prepared by SIRTOA personnel were later modified by various individual defendants; that with respect to testimony given at hearings, SIRTOA would generally compensate the charging officer's witnesses for their time but not so compensate witnesses requested by the employee; and that the supposedly neutral arbitrator selected by SIRTOA and the UTU was paid solely by SIRTOA and hence was biased. None of these contentions, however, present cognizable due process claims against the individual defendants. And, in any event, Munafo could have pursued his contentions in an Article 78 proceeding. It is undisputed that he failed to do so.

In light of the facts that are undisputed and the availability to Munafo of an Article 78 proceeding, we conclude that as a matter of law Munafo's assertions present no cognizable due process claims against the individual defendants. Accordingly, those defendants should have been granted summary judgment on the grounds of qualified immunity.

### C. *The Merits Appeal by the Corporate Defendants*

█ Institutional entities, unlike individual officials, have no right to invoke a

defense of qualified immunity, *see, e.g.,* *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir.1993) ("defense[ ] of ... qualified immunity ... [does] not belong to the governmental entity, and the entity itself is not allowed to assert [it].").  The summary judgment motion of the corporate defendants was thus directed simply to the merits of Munafo's claims.  The denial of such a motion, as discussed above, is not a collateral order and is not immediately appealable.

■ The corporate defendants ask us, as a matter of our discretion, to exercise jurisdiction over their appeal, pendent to our jurisdiction over the individual defendants' appeal from the denial of their qualified-immunity-based motions, arguing that the merits are inextricably intertwined with the issue of qualified immunity.  As to Munafo's First Amendment claims, of course, there is no longer any conceivable basis for the exercise of pendent jurisdiction because we have concluded that we have no jurisdiction to entertain the appeal of the individual defendants.  And while we do have jurisdiction with respect to the individual defendants' qualified-immunity defense to the due process claims, we decline to entertain the corporate defendants' merits-based appeal with regard to those claims.

■ In the federal system, there is a general presumption against immediate appellate review of nonfinal orders, and the Supreme Court has cautioned against the adoption of a "flexible" or "loose" approach in connection with the exercise of pendent appellate jurisdiction.  *See Swint v. Chambers County Commission*, 514 U.S. 35, 45–50, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995).  Accordingly, we have exercised such jurisdiction only in exceptional circumstances.  In *McCullough v. Wyan-*

*danch Union Free School District*, 187 F.3d 272, 277–82 (2d Cir.1999), for example, we exercised our discretion to entertain the merits-based appeal by a school district with respect to a due process "stigmatization" claim, pendent to our jurisdiction over the defendant superintendent's qualified-immunity-based appeal, where the plaintiff proffered no evidence of an essential factual element of that claim— *i.e.*, public disclosure of the stigmatizing allegations—and "no additional inquiry or analysis [wa]s necessary." *Id.* at 282. But we declined to consider the school district's appeal with respect to a second claim, as to which there was "insufficient overlap." *Id.* at 277–78.  In *Johnson v. Newburgh Enlarged School District*, 239 F.3d 246 (2d Cir.2001), although we had jurisdiction over the qualified-immunity appeal of the individual defendants—a teacher and several school administrators—we declined to exercise pendent jurisdiction over, *inter alia*, the defendant school district's contention that the plaintiff had failed to show a policy, custom, or practice allowing the teacher's conduct. We reasoned that consideration of municipal liability was not necessary to ensure meaningful review of the individual defendants' claims of qualified immunity. *See id.* at 255.

In the present case, it may well be, given the undisputed facts discussed in Part II.B. above, including Munafo's failure to pursue an Article 78 proceeding, that Munafo as a matter of law cannot succeed on his due process claims against the corporate defendants. However, these claims differ from those asserted against the individual defendants because Munafo complains that SIRTOA has a policy, custom, or practice of denying due process, having designed its system of disciplinary hearings and appeals to prevent employee complaints from receiving impartial consid-

eration. Since the corporate defendants have no right to an immediate appeal, we decline to perform the "cumbersome" task of combing the record to determine whether Munafo may have any better due process claim against the corporate defendants than he has against the individual defendants. The district court is of course free to revisit its denial of the corporate defendants' motion for summary judgment dismissing the due process claims.

## CONCLUSION

We have considered all of the parties' arguments with respect to appealability and with respect to the merits of the qualified-immunity motions as addressed to the due process claims, and, except as indicated above, have found these arguments to be without merit. The order of the district court is reversed insofar as it denied the individual defendants' qualified-immunity-based motions for summary judgment dismissing Munafo's due process claims against them. In all other respects, the appeal is dismissed.

No costs.