444 F.3d 158
 Louis J. CIOFFI III, Plaintiff-Appellant,
v.
AVERILL PARK CENTRAL SCHOOL DISTRICT BOARD OF ED., Averill Park High School, Averill Park Central School District, Thomas P. McGreevy and Michael J. Johnson, Defendants-Appellees.
Docket No. 04-5593-CV.
 United States Court of Appeals, Second Circuit.
 Argued September 7, 2005.
 Decided April 4, 2006.
 
 Thomas J. Marcelle, Albany, New York (Law Office of Thomas J. Marcelle, Albany, New York; Phillip G. Steck, Cooper Erving & Savage LLP, Albany, New York, of counsel), for Plaintiff-Appellant.
 Beth A. Bourassa, Albany, New York (Whiteman, Osterman & Hanna, LLP, Albany, New York, of counsel), for Defendants-Appellees.
 Before: CARDAMONE, POOLER, and RAGGI, Circuit Judges.
 CARDAMONE, Circuit Judge.
 
 
 1
 This appeal gives added credence to the ancient adage that the bearer of bad news has a losing office.[1] Such is literally true in this case if plaintiff's allegations are accepted. Plaintiff, a public school teacher, claims he expressed concern about a serious hazing incident to his employer the school board and, as a result, lost his job.
 
 
 2
 Plaintiff Louis J. Cioffi (plaintiff or appellant) claims his job as athletic director/director of physical education was abolished by his employer defendant Averill Park Central School District in retaliation for statements he made about a hazing incident involving high school football players. Cioffi brought a § 1983 employment retaliation action against the School District, the Averill Park Central School District Board of Education (Board of Education or Board), Thomas P. McGreevy, the president of the Board of Education, and Dr. Michael Johnson, the superintendent of the School District (collectively, defendants). When defendants moved for summary judgment dismissing his complaint, the United States District Court for the Northern District of New York (Hurd, J.) granted the motion in an order dated September 30, 2004, holding that Cioffi's statements were not constitutionally protected speech and, even if they were, he had shown no causal connection between his statements and the abolition of his position. The district court also held that defendants McGreevy and Johnson could not be sued in their individual capacities because they were entitled to legislative immunity.
 
 BACKGROUND
 
 3
 From 1981 to 1999 Cioffi was a part-time social studies teacher and part-time athletic director for the Averill Park Central School District. In June 1999 the School District appointed him to the position of full-time athletic director/director of physical education. He held that position for three years until June 2002.
 
 
 4
 As athletic director, Cioffi supervised Kevin Earl, the football coach at Averill Park Central High School. Earl coached the football team from 1994 to 2001. Over the years, Cioffi had complained to the School Board, previous superintendents, and the current superintendent defendant Johnson about Earl's coaching methods. Cioffi believed Earl was improperly supervising the players and that he was encouraging the high school athletes to use creatine, a muscle enhancing supplement that is considered dangerous.
 
 A. The Hazing Incident
 
 5
 In early October 2001 defendant McGreevy, the president of the Board of Education, received a letter from Lauren Ashdown, a parent of a high school football player. Ashdown relayed stories she had heard of disturbing misbehavior in the boys' locker-room such as a "shampoo bottle [being] shoved up [a student's] rectum." Cioffi and another administrator investigated Ashdown's allegations. The investigation led to an October 12, 2001 interview with a student on the football team. The student, a 14-year-old freshman, told Cioffi that he had been "tea-bagged" by other football players. Tea-bagging is a hazing act — indeed a form of sexual assault — during which the victim is pinned down on the floor by several players while another player rubs his genitalia in the victim's face. After the hazing was brought to Superintendent Johnson's attention, the School District took certain steps to address it, such as changing supervision protocols in the football locker rooms, seeking the involvement of the New York State Police, and advising parents in the School District that unspecified incidents of "sexual harassment and/or hazing" had been uncovered. The School District, however, failed to inform the parents of the freshman who had been the victim of the assault recited above.
 
 B. November 7, 2001 Letter
 
 6
 On November 7, 2001 Cioffi sent a letter to Superintendent Johnson which outlined his prior criticism of Coach Earl and Earl's supervision of the football team. In the letter, plaintiff expressed concern regarding the School District's handling of the subsequent investigation into the tea-bagging. He wrote also that his "overriding concern has been for the health and safety of [the] students, as well as for the school district potentially being held liable for professional misjudgment." Plaintiff requested that the superintendent forward his letter to the School Board, which Johnson did.
 
 C. Events From December 2001 to February 26, 2002
 
 7
 Media scrutiny and greater public interest in the hazing escalated in December 2001 when the public learned the details of the tea-bagging — specifically when the hazing victim filed a criminal complaint on December 1, 2001. This interest persisted for several months as a number of students and teachers were arrested and the entire high school football coaching staff was suspended. On January 22, 2002, however, the Board met in an executive session during which there was an informal consensus to abolish Cioffi's athletic director position as part of the budget for the coming year.
 
 
 8
 On January 31, 2002, after learning of the impending abolition of his position, Cioffi held a press conference during which he expressed his belief that the Board's decision to eliminate his position was in retribution for his criticisms regarding Coach Earl, the football program, and the investigation into the tea-bagging. Plaintiff reiterated his overriding concern for the student athletes.
 
 
 9
 A month later, on February 26, 2002, the Board met in public session to vote on the budget for the upcoming school year. It voted to approve the proposed budget which called for the abolition of Cioffi's position of athletic director. The budget created a new position, athletic director/assistant principal. The personnel change was justified on the grounds of fiscal savings to the School District. Although Cioffi lost his athletic director post, as a tenured teacher he exercised retreat rights which allowed him to return to employment as a social studies teacher at a salary lower than he earned as athletic director, but considerably higher than the pay of the teacher he replaced in the social studies department.
 
 DISTRICT COURT PROCEEDINGS
 
 10
 Cioffi brought this § 1983 action claiming defendants abolished his position in retaliation for the November 7, 2001 letter and his comments at his press conference. The district court granted summary judgment in favor of defendants on the grounds that (1) the November 7, 2001 letter and press conference are not protectable speech because they do not address matters of public concern; (2) even if Cioffi's speech constituted protectable speech, there is no causal connection between the speech and the elimination of Cioffi's job; and (3) Superintendent Johnson and President McGreevy were entitled to absolute immunity because the approval of the school budget by the Board was a legislative act. Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 2004 WL 2202761, at *3-*4 (N.D.N.Y. Sept.30, 2004). Cioffi appeals. We affirm in part, vacate in part, and remand.
 
 DISCUSSION
 I Applicable Law
 A. Standard of Review
 
 11
 We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to plaintiff and resolving all factual ambiguities in his favor. Konits v. Valley Stream Cent. High Sch. Dist., 394 F.3d 121, 124 (2d Cir.2005); Mandell v. County of Suffolk, 316 F.3d 368, 376-77 (2d Cir.2003). We, like the district judge, are not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of fact for trial exists when there is sufficient "evidence on which a jury could reasonably find for the plaintiff." Id. at 252, 106 S.Ct. 2505.
 
 B. First Amendment Rights of Public Employees
 
 12
 The rights of an individual like Cioffi to speak out on matters of public concern are enshrined in the First Amendment to the Constitution. It is well settled that public school teachers, or athletic directors, as in this case, do not check their First Amendment rights at the schoolhouse door when they enter public employment. See Melzer v. Bd. of Educ., 336 F.3d 185, 192 (2d Cir.2003). Nonetheless, it is also true that a public employer has a distinct interest in regulating the speech of its employees in order to ensure and promote the "efficiency of the public services it performs." Rankin v. McPherson, 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). The problem is to balance the employee's free speech rights with the interests of the public employer. See Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Thus, public employees like plaintiff do not enjoy free reign to speak out without regard to the interests of their public employer. See Bernheim v. Litt, 79 F.3d 318, 324 (2d Cir.1996) ("A public employee's right to freedom of speech is not absolute.").
 
 
 13
 A public employee who makes a First Amendment claim of employment retaliation under § 1983 must show that: (1) his speech addressed a matter of public concern, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and that adverse employment decision, so that it can be said that the plaintiff's speech was a motivating factor in the adverse employment action. Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999). Even if the plaintiff establishes these three elements, his claim remains subject to several defenses. First, the state may defend its actions by showing the employee's speech disrupted the workplace. Rankin, 483 U.S. at 388, 107 S.Ct. 2891; see Connick v. Myers, 461 U.S. 138, 151-52, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). To prevail with this defense the public employer must demonstrate that its interest in promoting an efficient workplace outweighs the employee's interest in commenting on matters of public concern. Connick, 461 U.S. at 140, 103 S.Ct. 1684. Also, the employer may avoid liability by demonstrating that it would have taken the same adverse employment action "even in the absence of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).
 
 C. Issues on Appeal
 
 14
 It is undisputed that abolishing Cioffi's position as athletic director was an adverse employment action. Because defendants do not contend Cioffi's speech disrupted or had the potential to disrupt the workplace, we need not balance Cioffi's First Amendment rights against the defendants' interests in maintaining an efficient workplace. See Velez v. Levy, 401 F.3d 75, 95 n. 19 (2d Cir.2005). We therefore concern ourselves with whether: (1) Cioffi's speech addressed a matter of public concern; (2) a causal connection exists between his speech and the abolition of his position; and (3) the defendants would in any event have abolished Cioffi's position in the absence of his speech.
 
 
 15
 Because Cioffi did not properly raise the issue on appeal — and as we discuss in more detail in a moment — we need not address whether President McGreevy and Superintendent Johnson, the individual defendants, enjoy absolute legislative immunity. Accordingly, the district court's grant of summary judgment in favor of these two defendants on the basis of legislative immunity must be affirmed.
 
 
 16
 II Is Plaintiff's Speech a Matter of Public Concern?
 
 A. What Speech?
 
 17
 We must first determine the speech at issue. Defendants contend Cioffi cannot use his January 31, 2002 press conference as the basis for his § 1983 claim because it came after the Board's informal decision to abolish his position. Bernheim, 79 F.3d at 325 (plaintiff "may not base her claim of retaliation upon complained-of acts that predated her speaking out"). We do not accept defendants' position.
 
 
 18
 The adverse employment action did not predate the press conference. Rather the adverse decision occurred not on January 22, 2002, but on February 26, 2002, the date of the official vote to abolish Cioffi's job. The Board's informal decision of January 22, held in executive closed session, was just that: informal. Board members were free to change their tentative votes when the official vote occurred a month later. Indeed the record reflects that what occurred on January 22 constituted no more than an "informal consensus." It was not until February 26, 2002 when the Board voted in public session, that an official adverse employment action could be said to have occurred. We therefore examine both the November 7, 2001 letter and the January 31, 2002 press conference to see if this speech relates to matters of public concern.
 
 B. The Speech at Issue is a Matter of Public Concern
 
 19
 The question whether speech addresses a matter of public concern and thereby enjoys protection under the First Amendment is one of law. See Connick, 461 U.S. at 148 n. 7, 150 n. 10, 103 S.Ct. 1684. We examine the "content, form, and context of a given statement, as revealed by the whole record" to make this determination. Id. at 147-48, 103 S.Ct. 1684. Generally, the First Amendment protects any matter of political, social or other concern to the community. Morris, 196 F.3d at 110.
 
 
 20
 Our review of the November 7, 2001 letter and January 31, 2002 press conference leads us to conclude that as a matter of law these instances of speech address matters of public concern and are therefore protected by the First Amendment. We examine the content of the speech first, followed by an analysis of its form and context.
 
 1. Content
 
 21
 The letter and press conference discuss and stem from an incident of obvious concern to the public — the sexual assault of a student on school property. Any community would be acutely interested in such an incident that constitutes nothing less than a criminal attack on a minor. The incident itself, the deficiencies in adult supervision that allowed it to occur, and the possible insufficiencies of the school's response implicate the health, welfare and safety of young students, all of which are matters of importance to the public. See, e.g., Calvit v. Minneapolis Pub. Sch., 122 F.3d 1112, 1117 (8th Cir.1997) (statements criticizing school child abuse policy deemed matter of public concern); Bernheim, 79 F.3d at 325 (statement regarding quality of education in school is a matter of public concern). State laws in New York criminalizing sexual assault and specifically sexual assault on children underscore the public's concern on this topic particularly where, as in this case, public criminal charges were filed against teachers and students in connection with such an assault. See N.Y. Penal Law § 130.00 (McKinney 2004) (defining sex offenses); id. §§ 120.16-120.17 (defining hazing); cf. Munafo v. Metro. Transp. Auth., 285 F.3d 201, 212 (2d Cir.2002) ("[O]ne would need look no farther than the existence of . . . similar state laws to recognize that safety in the workplace is a matter of public concern.").
 
 
 22
 To be sure, while the case before us involves a hazing incident that happens to constitute sexual assault, we do not imply that to be a matter of public concern an event need rise to the level of criminality. As noted above, the protections of the First Amendment are not so constrained. A matter of public concern is generally "any matter of political, social or other concern to the community." Morris, 196 F.3d at 110 (quoting Connick, 461 U.S. at 146, 103 S.Ct. 1684). We do not doubt that criminal activity in schools is of "social" or "other" concern to communities. Nor do we doubt that non-criminal activities may also be — depending on their form, context and content — matters of public concern, discussion of which is equally protectable under the First Amendment. See, e.g., Salge v. Edna Indep. Sch. Dist., 411 F.3d 178 (5th Cir.2005) (holding speech about reasons for school principal's resignation a matter of public concern).
 
 
 23
 In both the letter and press conference plaintiff addresses two issues that are of paramount interest to a community faced with a hazing incident in its schools: first, how the School District allowed such an incident to occur and, second, how the School District conducted its investigation into the hazing. With regard to how the hazing was allowed to occur, in his letter Cioffi discusses perceived defects in the level of oversight and supervision over Earl and the football program leading up to the incident. He states that Earl "was 'allowed' to run by a different set of rules from other faculty members and coaches." Cioffi also chronicles his many complaints about the football program over the years, indicating that his alarms were raised to no avail. Cioffi ends his letter voicing consternation about the manner in which the Board and school administration conducted the investigation. He states that he has "a problem accepting [the] explanation about why perpetrators [of the hazing] have not actively been sought out" and that his concern was that "others may have been victimized as well." At the press conference, Cioffi addresses again and in detail these same issues of oversight of Earl and the football program and the School District's handling of the hazing investigation. The content of the letter and press conference that we have pointed to here establish the very public nature of Cioffi's speech.
 
 2. Form and Context
 
 24
 The form and context of the letter and press conference also favor Cioffi. Although Cioffi sent the November 7 letter privately to Johnson and the Board only, it is not thereby deprived of First Amendment protection. See Rankin, 483 U.S. at 386 n. 11, 107 S.Ct. 2891 ("The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern."); Rookard v. Health & Hosps. Corp., 710 F.2d 41, 46 (2d Cir.1983) ("That [plaintiff's] speech was made privately, rather than publicly, did not remove it from First Amendment protection."). The subject of the letter was no mere private employment grievance, but assaultive conduct against a minor that, when publicly disclosed, triggered criminal charges as well as public outcry. As for the press conference, its form is plainly public, with Cioffi's remarks specifically directed to the community and the media.
 
 
 25
 Next we examine the context in which Cioffi spoke. Such review further convinces us that his speech addresses matters of public concern. Defendants admit that both the letter and press conference occurred while a media frenzy ensued around the hazing. In short, this is not a case in which we must divine the public's interest in the subject matter of plaintiff's speech. To gauge the community's interest in Cioffi's speech we need only look to the abundant press coverage accorded the hazing. See Salge, 411 F.3d at 188 (noting community's interest in subject matter of plaintiff's speech and fact that speech was made against backdrop of existing community debate). We do not mean to say that if there is no media interest in the subject matter of the employee's speech that the speech is not of public concern. Rather in this case, the fact of actual public interest further convinces us that Cioffi's communications touch upon matters of public concern.
 
 
 26
 After considering the content, form and context of the letter and press conference, we hold that both constitute protectable speech, addressing matters of public concern.
 
 C. Defendants' Response — Primary Purpose Argument
 
 27
 Notwithstanding the above, defendants urge us to focus solely on Cioffi's purpose in speaking out. They contend the speech relates only to personal matters because Cioffi's "primary purpose" in writing the letter and holding the press conference was to save his job by denying any personal responsibility for the hazing incident. This argument is unavailing.
 
 
 28
 To begin with, defendants' contention that a speaker's primary motivation for speaking is dispositive in determining whether speech is personal or public conflicts directly with the Supreme Court's holding in Connick. There, a public employee distributed a questionnaire to fellow co-workers in order to marshal support for her personal grievance with superiors. Connick, 461 U.S. at 148, 103 S.Ct. 1684. Although personal interest primarily motivated the speech, the Supreme Court concluded that one of the questions on the questionnaire touched upon a matter of public concern and was thus protected by the First Amendment. Id. at 148-49, 103 S.Ct. 1684. In other words, although the speaker's overall motivation was personal, that fact was not dispositive.[2] If it were, then the Supreme Court's direction that we examine the content, form, and context of a given statement to determine whether it addresses a matter of public concern would be stripped of its meaning and purpose.
 
 
 29
 Our analysis is content-based and not, as defendants would have it, solely motivation-based. See Chappel v. Montgomery County Fire Prot. Dist. No. 1, 131 F.3d 564, 575 (6th Cir.1997). As the Sixth Circuit stated in rebutting an argument identical to that offered by defendants here, Connick recognized the distinction between "matters of public concern and matters only of personal interest, not civicminded motives and self-serving motives." Id. Having a personal stake or motive in speaking does not, on its own, vitiate the status of the speech as one of public concern. See Johnson v. Ganim, 342 F.3d 105, 114 (2d Cir.2003); Munafo, 285 F.3d at 211-12 (rejecting contention that plaintiff's speech not of public concern because plaintiff motivated by personal interest); Brennan v. Norton, 350 F.3d 399, 413 (3d Cir.2003) (while speaker's motive is relevant part of context of speech, it is not dispositive when determining whether the speech relates to a matter of public concern); O'Donnell v. Barry, 148 F.3d 1126, 1134 (D.C.Cir.1998) (motivation is a factor in the public concern analysis but does not destroy character of speech as matter of public concern).
 
 
 30
 Moreover, we are not persuaded as a matter of law that plaintiff was motivated solely by personal interest. In the November 7 letter he states that his "overriding concern has been for the health and safety of [the] students, as well as for the school district potentially being held liable for professional misjudgment." Plaintiff reiterated these motivations during his press conference. We do not doubt that he spoke partly to protect his job and shift blame to other administrators. But personal interests frequently induce speech that is nonetheless of public concern. See, e.g., Johnson, 342 F.3d at 114 ("[T]he mere fact that [plaintiff] took a personal interest in the subject matter of the speech does not remove the letter from the protection of the First Amendment."). Motive may inform our inquiry, see Brennan, 350 F.3d at 413; O'Donnell, 148 F.3d at 1134, but as noted above, even an entirely personal motive in speaking is not dispositive, see Connick, 461 U.S. at 148-49, 103 S.Ct. 1684.
 
 
 31
 Indeed, defendants' portrayal of Cioffi's speech as a "don't blame me" measure bolsters, rather than diminishes, the public nature of the speech. By proclaiming that he is not to blame, Cioffi presents a theory of what went wrong and who is to blame. We extend First Amendment protection to public employees not only in furtherance of their interest in speaking, but also in furtherance of the public's interest in obtaining information about matters of public import from those in the best positions to know most about it; or, as the Supreme Court instructs, "[g]overnment employees are often in the best position to know what ails the agencies for which they work." Waters v. Churchill, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).[3]
 
 
 32
 A school official, like Cioffi, who supervised the School District's athletic programs and personally investigated the initial allegations of hazing, is well suited to provide information to local citizens and parents regarding this matter of public concern. Were we to accept defendants' proposition that Cioffi's speech is not a matter of public concern simply because it personally and directly affects him "would mean that only those persons with the least amount of firsthand knowledge about the subject matter could utter speech without fear of government reprisal." Johnson, 342 F.3d at 114. As painful and embarrassing as it may be to defendants, the public has a pointed interest in obtaining information not only about the fact of the hazing, but also the possible administrative failures that allowed it to occur. Cf. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (recognizing criticisms of public officials is at core of speech protected by First Amendment).
 
 
 33
 Of course we have no opinion with respect to the truthfulness of Cioffi's speech and whether he, the Board of Education, or other administrators are to blame. The truth of his statements, especially on summary judgment, does not bear on whether the speech is personal or public. Salge, 411 F.3d at 185 ("Whether an employee's speech is true or false also plays no role in the determination whether the speech concerned a matter of public interest."); see also Konits, 394 F.3d at 124 (resolving ambiguities and drawing factual inferences in favor of plaintiff).
 
 
 34
 In support of their primary purpose test defendants mistakenly seize upon Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775 (2d Cir.1991). We did not hold in Ezekwo that when a speaker is motivated by personal interest, that alone takes the speech out of the public sphere. Nor did we articulate a primary purpose test. Rather, we applied Connick's content, form and context test, holding that "[v]iewed objectively and as a whole, [the public employee's] statements did not address matters of public concern." Id. at 781. While the employee's motive in Ezekwo informed our analysis, it was only one of many factors considered under the settled test of content, form and context. To the extent defendants read Ezekwo to announce a primary purpose test, they are mistaken.
 
 III Causation
 
 35
 We now turn to the question of causation. The district court held that even if Cioffi's speech is protected, there was no causal connection between his speech and the abolition of his position. Cioffi, 2004 WL 2202761, at *3. We are unable to adopt this view as a matter of law.
 
 
 36
 To establish causation, a plaintiff must show that the protected speech "was a substantial motivating factor in the adverse employment action," Morris, 196 F.3d at 110, and we review the record only to determine whether Cioffi has presented evidence sufficient to raise a triable issue on causation, see Anderson, 477 U.S. at 249, 106 S.Ct. 2505; Hale v. Mann, 219 F.3d 61, 71 (2d Cir.2000). In our view, Cioffi has done so. A plaintiff may establish causation indirectly by showing his speech was closely followed in time by the adverse employment decision. Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir.2001); Morris, 196 F.3d at 110. Only a short time passed from Cioffi's speech to the abolition of his job. The Board abolished Cioffi's position on February 26, 2002, a little over three months after his November 7, 2001 letter and only three weeks after his January 31, 2002 press conference. We cannot agree that these time periods are too long for any inference of retaliatory motive and causation to be drawn. No "bright line. . . define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos, 252 F.3d at 554. We do not attempt to determine the outer limits of temporal proximity, nor do we need to.
 
 
 37
 On the facts of this case, the lapse of only several months after the letter and several weeks after the press conference between the protected speech and adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment. See id. at 555 (passage of up to five months short enough for causal connection); Richardson v. New York State Dep't of Corr. Service, 180 F.3d 426, 446-47 (2d Cir.1999) (acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir.1980) (eight month gap between EEOC complaint and retaliatory act suggested causal relationship).
 
 
 38
 IV Absent Plaintiff's Speech Would Defendants Have Abolished His Position?
 
 
 39
 We turn next to defendants' defense that absent Cioffi's letter and press conference, they would have abolished his job anyway. See Mount Healthy, 429 U.S. at 287, 97 S.Ct. 568. Defendants declare the School District faced a budgetary crisis and the abolition of Cioffi's job created a net cost benefit to the District. Defendants would have therefore abolished his position for these budgetary reasons even had he never written the letter or held the press conference.
 
 
 40
 Plaintiff presented facts to the contrary. As the district court noted, based on the facts viewed most favorable to Cioffi, the Board decided to abolish his job "despite the fact there was no real fiscal crisis." Cioffi, 2004 WL 2202761, at *2. With no budgetary crisis, a reasonable jury could find that the defendants would not have taken the same action against Cioffi absent the letter and press conference. Cioffi also presented facts disputing the cost benefit to the School District. The reorganization resulted in the creation of a new position — athletic director/assistant principal. The School District hired someone to fill this new position at a salary lower than Cioffi's. But Cioffi, as a tenured teacher, exercised his retreat rights, requiring the School District to continue employing him as a teacher at a salary which was lower than his previous salary, but considerably higher than the teacher he replaced. These facts call into question the allegation that the School District had in fact achieved a net savings by abolishing Cioffi's position. These factual disputes preclude granting summary judgment for defendants on the basis of this defense.
 
 V Absolute Immunity of Individual Defendants
 
 41
 We pass finally to the issue of absolute immunity, or, rather, why we decline to reach that issue. The district court held that "the two individual defendants, [Superintendent] Johnson and [President] McGreevy, are entitled to absolute legislative immunity because [Cioffi's] position was eliminated as part of the budgetary process, a legislative activity." Cioffi, 2004 WL 2202761, at *4. Neither Cioffi's notice of appeal nor his opening brief discuss, let alone dispute, the district court's holding that absolute legislative immunity protects the two individual defendants from suit. The first time the issue of legislative immunity is raised is in plaintiff's reply brief. As such, the issue is not properly before us, because we deem it waived. See Fed. R.App. P. 28(a)(5), (9) (setting forth what appellant must include in his briefing); Thomas v. Roach, 165 F.3d 137, 145-46 (2d Cir.1999) (refusing to consider argument raised for the first time in appellant's reply brief).
 
 
 42
 Defendants' motion to strike that part of Cioffi's reply brief, which raises for the first time the issue of legislative immunity, is granted. We decline, however, defendants' request to assess sanctions against plaintiff in the form of attorney's fees and costs.
 
 CONCLUSION
 
 43
 We affirm the district court's judgment insofar as it granted summary judgment in favor of the individual defendants, Johnson and McGreevy, and dismissed plaintiff's complaint against them; we vacate the grant of summary judgment in favor of the School District, Board and other municipal defendants, and remand to the district court for further proceedings consistent with this opinion.
 
 
 44
 Affirmed in part, vacated in part, and remanded.
 
 
 
 Notes:
 
 
 [1]
 Yet the first bringer of unwelcome news
 Hath but a losing office, . . .
 William Shakespeare, The Second Part of King Henry the Fourth, act I, sc. I, 1. 100-01, in The Complete Works of William Shakespeare 506 (W.J. Craig ed., Oxford Univ. Press 1928).
 
 
 [2]
 While theConnick Court held that one question on the questionnaire was a matter of public concern, the Court ultimately held in favor of the government after balancing the government's interest against the employee's free speech interest. See Connick, 461 U.S. at 150-54, 103 S.Ct. 1684.
 
 
 [3]
 The Supreme Court's forthcoming decision inGarcetti v. Ceballos, cert. granted, 543 U.S. 1186, 125 S.Ct. 1395, 161 L.Ed.2d 188 (2005), as to whether the First Amendment protects an employee's purely job-related speech about a matter of public concern expressed pursuant to the duties of employment, does not affect the disposition of this case because the record here establishes that Cioffi's speech was not made strictly pursuant to his duties as a public employee. Rather, he was speaking as a citizen, who also happened to be a public employee, about the circumstances that led to criminal activity in the public school system and the manner in which school officials were responding to that conduct. In both the November 7 letter and the subsequent press conference, Cioffi emphasized that his primary concern was the health and safety of the students involved.